**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TOM BRUCE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No.:_____** |
| | § | |
| **BARRY GORE, E-GUIDE SERVICES, INC.,** | § | |
| **(a Texas Corporation), DEAN MANSON,** | § | |
| **CHRIS STARK, FYI TELEVISION, INC.,** | § | |
| **VERTICAL MEDIA HOLDINGS, INC. ,** | § | |
| **(a Texas Corporation),** | § | |
| **BILL DRAYER, and RICK MODENA,** | § | |
| | § | |
| **Defendants.** | § | |

---

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

     **COMES NOW, TOM BRUCE** , hereinafter, Plaintiff, in the above-styled and numbered cause of action and files this Complaint against the above-named Defendants and shows this Honorable United States District Court as follows:

### I.
### PARTIES

    1.    Plaintiff Tom Bruce is an individual residing in El Granada, California.

    2.    Defendant Barry Gore ("Gore") is an individual residing in Tarrant County, Texas. Gore is a principal of Defendants E-Guide Services, Inc. and Vertical Media Holdings, Inc., and acted as an agent of Defendants E-Guide Services, Inc. and Vertical Media Holdings, Inc. Gore may be served with process at his principle place of business at 2000 E. Lamar Blvd, Suite 600, Arlington, Texas 76006.

3.     Defendant E-Guide Services, Inc. ("E-Guide") is a Texas Corporation with its principal place of business at 1901 N. State Highway 360, Grand Prairie, Texas 75050-1412 whose Registered Agent is Christopher S. Stark, Sr. and may be served with process at its principal place of business.

4.     Defendant Dean Manson ("Manson") is an individual residing in Dallas County, Texas.  Manson may be served with process at Inwood National Bank Building, 1801 N. Hampton Road, # 210, DeSoto, Texas 75115

5.     Defendant Chris Stark ("Stark") is an individual residing in Tarrant County, Texas.  Stark is a principal of Defendants E-Guide Services, Inc. and FYI Television, Inc., and acted as an agent of Defendants E-Guide Services, Inc. and FYI Television, Inc.  Stark may be served with process at his principle place of business at 1901 N. State Highway 360, Grand Prairie, Texas 75050-1412.

6.     Defendant FYI Television, Inc. ("FYI"), is a Texas Corporation with its principal place of business at 1901 N. State Highway 360, Grand Prairie, Texas, 75050-1412 whose registered agent is Christopher S. Stark, Sr. and may be served with process at its principal place of business.

7.     Defendant Vertical Media Holdings, Inc. ("VMH") is a Texas Corporation with its principle place of business in Tarrant County, Texas.  VMH may be served through its registered agent Corporation Service Company d/b/a CSC-Lawyers Inco., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

8.     Defendant Bill Drayer ("Drayer") is an individual residing in Clark County, Nevada, and may be served with process at his principle place of business at 2229 Starline Meadow, Las Vegas, Nevada, 89134.

9. Defendant Rick Modena ("Modena") is an individual residing in San Mateo County, California, and may be served with process at 2570 La Honda Road, San Gregorio, California 94074.

## II.
## JURISDICTION

10. The court has Subject Matter Jurisdiction over this action pursuant to 15 U.S.C. § 78aa; 15 U.S.C. § 1331; and 15 U.S.C. § 1367(a).

11. Personal Jurisdiction exists over Defendants Gore, Stark, FYI, Manson, E-Guide, and VMI because they are residents of this state.

12. Personal Jurisdiction exists over Defendants Drayer and Modena because they executed contracts with a Texas Company, maintained regular and continuous contacts with Defendant Gore for the purposes of participating in an illegal racketeering scheme and receiving ill-gotten gains therefrom. Further, these Defendants knowingly and actively participated in a conspiracy occurring in this state.

## III.
## VENUE

13. Venue is proper in this District Court in that a substantial part of the events or omissions occurred giving rise to the claims of the Plaintiff within this district. See 28 U.S.C. § 1391(b)(2). Venue is proper in this District Court.

## IV.
## PERSONAL JURISDICTION

14. Specific jurisdiction exists when, as here, the Defendants' contacts with the forum state arise from, or are directly related to, the Plaintiff's cause of action. *Helicopteros Nacionales de Colombia v. Hal1*, 466 U.S. 408, 414 n.8 (1984). A district court has specific jurisdiction if the defendant committed at least one act in the forum state substantially related to

the suit, which is the case here as demonstrated *infra*. Defendants' soliciting of Plaintiff in Dallas, Texas to enter into the agreement(s) underlying this case also subjects Defendants to *in personum* jurisdiction here. *Rainbow Travel Serv. Inc. v. Hilton Hotels Corp.,* 896 F2d 1233, 1238 (10th Cir. 1990); *see also Lewis v. Fresne*, 252 F3d 352, 358-59 (5th Cir. 2001) (making a single phone call or mailing allegedly fraudulent materials to or from the forum state qualifies for *in personum* jurisdiction over Defendant). Accordingly, this Court has Personal Jurisdiction over all Defendants named herein.

**V.**
**STATEMENT OF FACTS**

15.     Plaintiff operates a construction business in and around San Mateo, California. Through his business operations he met Defendant Modena. Plaintiff did business with Modena intermittently from 1994 to 2006, and invested much time and trust in his relationship with Modena. In mid-2006, Modena mentioned that he (Modena) was doing some investment deals with Drayer, who was like "a second father to him." Modena explained Drayer and Gore were offering "gold assayer" investment contracts with potential short term returns. Based upon these assurances, Plaintiff tendered $25,000.00 to Modena for forwarding to Drayer/Gore for these "gold assayer" investment contracts.

16.     On or about October 28, 2006, Modena brought Defendants Drayer, Modena, and Gore to a location where Plaintiff was building a house. Following introductions, Gore presented checks to Plaintiff and Modena in the amount of $30,000.00 as the return of principle and profit for the "gold assayer" investment agreements. Gore proceeded to tell Plaintiff about "another investment opportunity" with Gore's company, HFS Technologies. Gore stated the company was in the business of installing televisions into hotel chains, and in conjunction with new agreements with a company called "HTG," would offer closed-circuit advertising services

for local attractions, businesses, and hotel services.  Gore assured Plaintiff the investment was safe, "not a start up," rather, something Gore had been "working on for years."

17.     Gore continued to assure Plaintiff the HFS-HTG business was developed and backed by existing advertisers by specifically naming Home Depot and Blockbuster as current advertisers providing continuing operating revenues under the business model set forth by Gore. As Gore continued the "hard sell" of the HFS-HTG investment to Plaintiff, he stating he was only in need of a few investors, and the only two investment levels for the investment were $125,000.00 and $250,000.00.  During this discussion, Modena stated he was getting two (2) $125,000.00 contracts personally, by which he was financing them through the sale or borrowing against his ranch.  Modena's assertion that the HFS-HTG investment was extraordinarily strong and safe, according to him, was he personally trusted and knew Drayer and Gore and they were honest and capable business executives absolutely deserving of trust in accepting and investing one-half of a million dollars ($500,000.00) allegedly invested by Plaintiff and Modena.

18.     Based upon these specific representations by Gore, and the fact that a known, trusted confidant such as Modena was investing at such a high level relative to his modest expendable income, Plaintiff executed a "subscription agreement" for the HFS-HTG investment ("Hoteleguide") as represented by Gore.  Plaintiff has come to learn the subscription agreement executed by him was drafted and developed by Gore.  Plaintiff also discovered Drayer was hired and acting as a direct securities sales broker-agent on behalf of Gore and at his express direction, under the title of "Director-Business Development West Coast," and was supposed to be paid $4,166.00 per month.  Instead, Gore paid Drayer "commissions" based upon the size of the investor payments, ranging from $1,000.00 to $13,000.00.  Drayer was paid at least $88,000.00 under express agreement drafted and executed by Gore for the illegal procurement of investor

money.

19.    At no relevant time was Gore or Drayer licensed or registered as securities sales agents, brokers, or dealers under federal or state securities regulations or licensing commissions. In fact, Gore allegedly held series 6 and 7 sales agent licenses prior to 2006, but lost them for reasons unknown at this time.   Gore attempted to build-in registration exemption language to the subscription agreement(s) signed by Plaintiff and others, as they contain cursory language referencing compliance with Regulation D (Private Offering).   However, the content of the document wholly fails Regulation D exemption compliance in every form or fashion, including the lack of accredited investor questionnaire, and the time period, number of investors, and geographical limitations of investors as required by Regulation D.   At last count, Gore and his accomplices illegally took money from over one hundred and fifty (150) unsuspecting investors covering a sixteen (16) month period.

20.    Gore misrepresented the Hoteleguide Investment to Plaintiff on many, many other fronts.   Similar to the assurances to Plaintiff about the participation of Blockbuster and Home Depot, Gore told several investors in late 2006 and early 2007 that Hoteleguide was "up and running," while it was still in developmental stages.   Several months later, after receiving millions of dollars in investor money and conducting operations, Gore represented Hoteleguide as a "start-up" in order to convince later investors to take "per room" compensation for their investments, such investments often not exceeding $5,000.00 to $10,000.00 from persons clearly not qualifying as "accredited investors" under Regulation D.

21.    Shortly following the October 28, 2006 meeting, Plaintiff contacted Gore and Drayer and discussed the financial strain an overly extended investment and pay-off period would have on Plaintiff and his family.   Gore and Drayer assured Plaintiff of the viability of the

investment and that they would not put a trusted associate such as Modena in a bad situation, and again confirmed **Modena invested the amount of $250,000.00 with Gore through Hoteleguide** under the same conditions as Plaintiff.  Plaintiff specifically and particularly relied upon Modena's decision to invest, as he did not know nor have any reason to trust Defendants Drayer and Gore otherwise.

22.     The weeks following Plaintiff's tendering of the $250,000.00 brought nothing but upbeat news from Gore and Drayer about the status of the Hoteleguide business and likelihood of repayment of Plaintiff's entire investment on or about March 31, 2007.  In addition, Gore and Modena contacted Plaintiff to inform him some smaller investment contracts in Hoteleguide "became available."  Modena stated that he purchased an **additional** $90,000.00 in Hoteleguide investments.  Plaintiff contacted Gore and Drayer about the new, smaller contracts and was told by both they were as safe and strong on return (amount and timing) as the larger contract Plaintiff purchased earlier.  Based upon these representations, Plaintiff caused another $150,000.00 to be forwarded to Gore for investment in Hoteleguide in the names of Plaintiff's wife, kids and business partner.

23.     March 31, 2007 came and went without the promised repayment of Plaintiff's investment.  Modena stated that according to Gore and Drayer, the repayment would be coming in July 2007.  As the new repayment deadline approached, Plaintiff learned Gore was leaving Hoteleguide.  Plaintiff contacted Gore, who confirmed he started a new company competing with Hoteleguide, and Defendant Dean Manson would be in charge of Hoteleguide and investor relations.  Plaintiff inquired about the status of the repayment as promised by Gore and Drayer.  Gore responded that Plaintiff's money was safe and Manson "would take care of it."  Plaintiff later found out this statement was knowingly made and false, and Gore and Manson were

scheming to avoid liability for these "investment agreements."  This was not the first, nor last, false statement of fact made by Gore.

24.     Eventually Plaintiff discovered most or all of Gore's representations about his background, qualifications, experience, development of Hoteleguide, and the specific representations about the status of Hoteleguide's business were false; that Gore and Drayer, with the assistance of Manson and later Stark, FYI and others, planned to remove all of Hoteleguide's assets, including those acquired with investor money, and place them with Defendant E-Guide Services, and later, by fraudulent transfer, to Gore's Vertical Media Holdings entities.

25.     In soliciting Hoteleguide's true founders, Justin Godsey and Jed Martin, to do business with him, Gore held himself out as a "money man," claiming he had over $57,000,000.00 in personal funds available for use in the business.  Soon thereafter, Gore changed his story that the money was available to him through investors with whom he had a close trusting relationship.  Based upon this misrepresentation, Gore was told to seek out such funds from his investor network.  Thus, Gore and Drayer "legitimized" their investor solicitations as mere visits with wealthy individuals to which Gore had access and prior relationships, when, in fact, Gore and Drayer were preying on the uniformed, unaccredited investor who saw an opportunity to invest what little funds they possessed for a "sure thing" consistent with Gore's false representations.

26.     The entirety of Gore's story to Hoteleguide's founders and the investors was false and fabricated, as was Gore's written and oral representations of his past business experience and relevant projects.  In marketing the alleged rights conferred by the Subscription Agreement, Gore told Plaintiff he helped develop the technical and operational aspects of certain closed–circuit satellite and cable advertising technology used by Hoteleguide, and he managed a financial firm

called "Gore, Lindblom & Co." since 1999, specializing in "financial structuring." He also claimed majority ownership in an entity called "In Room Technology" acting as a "complimentary business."

27.     Gore is actually a career fraud, litigant, and "parasite" sticking himself to business concerns, operations, and/or opportunities, seeking "investment funds" (illegally) from unsuspecting victims, while at the same time planning to strip the same businesses of their assets through self-dealing schemes, and eventually exiting the business under suspicious conditions with ill-gotten gains to transition to another "host." For instance, Gore's "financial structuring" business since 1999 consisted of managing a ruse of a company called HFS Technologies, illicitly seeking investment monies from unwitting investors while having no real business operations and no true plan to make such investors whole, or even to return part of such funds.

28.     Unbeknownst to Plaintiff, at the time of their initial meeting about the Hoteleguide Investment, Gore was actually living off property and funds owned by Gore's former fiancée, Joanne Schaap. Every part of Gore's qualifications and representations to Plaintiff about his relevant experience, business dealings, and personal wealth were false, misleading, and intended to fool investors such as Plaintiff into giving him funds for non-existent investments. Gore lived off of Ms. Schaap's assets in Las Vegas, Nevada until he was exposed for the fraud he is, and Ms. Schaap expunged him from her life, wisely.

29.     Gore also made several false statements and material misrepresentations to Plaintiff about the status of Hoteleguide's business and financial position. Gore told Plaintiff and other investors Hoteleguide was already contracting with advertisers providing regular and substantial cash flow. These representations were false. Gore failed to disclose material information, or correct misinformation provided by him, namely: (1) he was barred from the

securities industry; (2) he had spent nine (9) months in prison for failure to pay child support; (3) once investor money was illegally received by him, he took a percentage of such funds; (4) his right-hand man and eventual CEO of Hoteleguide, Defendant Dean Manson, was a disbarred attorney with multiple visits to federal prison for fraud-related crimes including bank fraud and mail fraud; and (5) Gore did not have the experience, qualifications, wealth or resources to make Hoteleguide, or any other business concern, successful.

30.     Indeed, Plaintiff learned that about June 15, 2007, around the time of Gore's departure from Hoteleguide, Gore contacted all of Hoteleguide's vendors, customers, and employees and planned a theft and transfer of substantially all of Hoteleguide's corporate assets. In addition, Gore was actively planning to take all of Hoteleguide's assets, including investor funds and assets purchased therewith, with him to capitalize E-Guide, and later Vertical Media Holdings.   Shockingly, the entire plan involving Gore, Manson, Stark, FYI, and others is specifically detailed in a memo from Manson to Gore and others dated October 19, 2008.

31.     These material false statements and omissions were intentionally intended to and did induce Plaintiff and his family and friends to tender money to Gore for alleged investment in Hoteleguide, totaling $400,000.00.  Plaintiff's reliance thereon was reasonable and appropriate under the circumstances.

32.     Gore also failed to disclose to Plaintiff that Drayer was receiving fees from Plaintiff's investment, and Gore likewise intended to take disbursements of cash, thereby reducing the actual funds used in Hoteleguide's business to make for a profitable operation and satisfied investors.  However, the evidence proves Gore never intended to make Hoteleguide profitable for owners, investors, or employees.  At all times relevant, Gore intended to build up the operations of Hoteleguide with investor money, then strip the assets, customer and contracts

of Hoteleguide to benefit himself only, his defrauding associates, and a willing vendor participating in the scheme, FYI Television, Inc.

33.     On June 8, 2007, Gore officially "handed off" the illegal and fraudulent securities issuance to Manson, instructing him on what documents to use, who to contact, and how to procure funds from future investors.  Indeed, Manson solicited other investors based upon Gore's plan and documents from June 2007 to April 2008.  On October 19, 2008, Manson penned a highly incriminating memo detailing the plan to strip Hotelguide's assets off and allow Gore to submit the involuntary petition to cover up the Defendants' wrongdoing regarding the illegal securities issuance by Gore and continued through Manson.  Manson detailed the Defendants' plan to "[acquire] the contracts with the hotels, MDU's and college campuses that the hold all of which need to be canceled and replaced by contracts that are for longer than month to month terms and that do not provide for income to be paid to the end user (hotel, etc.)."

34.     According to company records, Gore systematically bilked Hoteleguide's assets by "loan disbursements" to himself timed with the receipt of Investor funds, such as Plaintiff's. For instance, Plaintiff's first funds were received and deposited in Hoteleguide's account on or about November 3, 2006.  On December 1, 2006, Gore transferred $14,500.00 to "HFS Technologies,"and transferred an additional $4,500.00 to HFS on December 8, 2006.  Gore additionally paid himself out of investor funds on December 1, 2006 ($5,000.00), December 11, 2006 ($7,500.00), December 21, 2006 ($5,000.00), December 22, 2006 ($3,000.00), January 5, 2007 ($5,000.00), January 12, 2007 ($5,000.00), January 17, 2007 ($5,000.00) and January 22, 2007 ($3,000.00).  He continued this process until leaving the company in June 2007, after "loaning" himself approximately $76,000.00 of investor funds.  Gore left Hoteleguide on or about June 14, 2007 after a dispute with ownership in a financially locked Three Hundred

Thousand Dollar ($300,000.00) deficit, and with unpaid payroll taxes after taking almost Two

Hundred Thousand Dollars ($200,000.00) out of the company.

35.     By August 15, 2007, Gore was actively competing with Hoteleguide through

E-Guide Services, Inc., a company set up by him and Defendant Stark, managing executive for

Hoteleguide vendor "FYI Television, Inc."  Within a few months, Gore managed to convince

Hoteleguide's customers, vendors and key employees to terminate their relationships with

Hoteleguide, in patent violation of non-compete agreement signed by him.  In December 2007, a

lawsuit was filed against Gore and his accomplices styled *Hoteleguide v. Gore, et al.,* by David

Gibson, Esq., counsel and office mate of Defendant Dean Manson.  The case lingered for almost

two (2) years, without a deposition being taken or a single document produced by Defendants.

36.     Days before a trial setting in the state court case filed by Hoteleguide against him,

Gore made good on promises contained in correspondence between him and Defendant Manson

on June 14, 2007 and October 19, 2008 and filed an involuntary bankruptcy petition against

Hoteleguide in order to derail the claims against him and Defendants Stark, FYI and others.

Gore's involuntary petition was and is defective on its face, as it fails to join the requisite number

of creditors in order to comply with section 303 of the Bankruptcy Code, and contains disputed

and unliquidated claims not properly subject to an involuntary petition under the express terms of

the Bankruptcy Code.

37.     Mysteriously, Hoteleguide's counsel, David Gibson, failed to timely answer the

suit, therefore permitting the bankruptcy liquidation of Hoteleguide to go forward despite Gore's

numerous failures to comply with the mandatory requirements of section 303 of the Bankruptcy

Code.  Interestingly, Manson and Gibson are office mates, business associates, and cooperate

together in client and business referrals between them.  Considering the close and conspiring

relationship between Gore and Manson, the obvious defects contained in Gore's petition, and repeated statements by Manson, Gore, and their accomplices about Gore's plans to drag Hoteleguide into an involuntary proceeding, there exists the possibility Mr. Gibson's "oversight" resulted from collusion, conflict of interest, and fraud.

38.     Plaintiff will show active participation and conspiracy between the Defendants to (1) violate state and federal securities laws to induce Plaintiff's ill-fated investment in the HFS-HTG investment, which eventually became the "Hoteleguide" investment; (2) to conspire together to build up Hoteleguide's assets through capital contributions from "investors" and limited business operations; and (3) to create company funds to be taken by Gore, at will, without intending to comply with the "subscription agreements" drafted by him and Manson, including ignoring and express promises of re-payment to pay investors such as Plaintiff, (4) with the express intent and knowledge that Gore would file an involuntary bankruptcy against Hoteleguide to try to escape liability form the company and investors.  Gore, through his constant communications with Manson while Manson was acting CEO of Hoteleguide, made this plan and intent apparent on several occasions, including June 14, 2007 and October 19, 2008. Gore and Manson failed to disclose to their victim-investors that, while taking investor money, they were actively planning to bankrupt Hoteleguide.  Defendants Stark and FYI were aware of this plan and promoted the sale of Hoteleguide securities with knowledge of Manson and Gore's intent to misappropriate Hoteleguide's assets through bankruptcy or otherwise.

39.     During the period between June 2007 and August 2007, Gore directed Manson specifically about how to continue the solicitation of investor money with the documents created by him and the illegal retention of Drayer.  In fact, upon Manson's renewal of the investment solicitation efforts, Drayer soon contacted Manson, demanding more money for his "services."

Gore specifically instructed Manson on how to solicit these funds for existing and new "investors," and Manson made several trips to California during this period to directly solicit funds from investors.   At all times relevant, Manson and Gore knew (1) the subscription agreements were and would always be without value, because (2) Gore was actively soliciting and transferring all of Hoteleguide's customers and vendors to E-Guide, and (3) if necessary, Gore would file an involuntary bankruptcy petition against Hoteleguide based upon a debt and liability directly created by Gore — the unpaid payroll taxes totaling roughly the amount of money Gore illicitly removed from Hoteleguide.

40.     Plaintiff spoke to Defendant Manson on several occasions between June 2007 and April 2008, and Manson never disclosed (1) he and Gore were in regular and constant contact about Hoteleguide's business, (2) the status of Hoteleguide's assets, (3) the status and extent of Gore's competitive business, (4) the ultimate plan for removal of the assets, contracts, and important vendor relationships by Gore, Manson, Stark, and FYI for the benefit of them and E-Guide Services, Inc., and (5) the plan for Gore's filing of an involuntary bankruptcy petition against Hoteleguide, eliminating the value of any (illegally sold) investment product by Gore and Manson.

41.     What Manson did disclose during these conversations between Plaintiff and Manson was that he was the acting CEO in charge of investor relations and communications, the company was doing well, and he (Manson) would personally contact Plaintiff and other investors with material updates regarding repayment of the subscription agreements held by Plaintiff, and the financial status of the company.   At Gore's direction, Manson was making representations of profitability

42.     Plaintiff will show that in soliciting investment monies for the "subscription

agreements," Gore had a duty to disclose that he was conducting certain activities and contemplating certain transactions that materially affected the value of investors' contributions to Hoteleguide under the subscription agreements executed by them.  Defendants Manson, Stark, and FYI knew or should have known that Gore, and later, Manson at the express promotion and instruction of Gore, was illegally soliciting investor funds during and after the execution of Gore and Manson's plan to rob Hoteleguide of its assets.  Thus, in their role assisting Gore to misappropriate Hoteleguide's assets, Stark and FYI aided and abetted Gore and Manson in promoting and assisting in the illegal ends of Gore's and Manson's fraud in the sale of securities, sale of non-exempt, unregistered securities, and other violations of state and federal law.

43.     Furthermore, unbeknownst to Plaintiff, during the conversations between he and Manson wherein Manson agreed to produce accurate, detailed and updated company information and assuring future profitability on Plaintiff's investment, Manson was planning with Gore and Stark to render Plaintiff's investments worthless by forming a new company, leaving Plaintiff and other investors behind and rendering the subscription agreements worthless.  On October 19, 2008, Manson detailed this plan in a communication between him and Gore, Stark, and potential investors of an entity to assume Hoteleguide's assets.

44.     Following the filing of Gore's involuntary bankruptcy petition against Hoteleguide, Plaintiff discovered Gore fabricated Modena's original investment document, and Gore admits, in writing, Modena tendered no money and was merely used as an inducing factor to get Plaintiff's initial $250,000.00 investment in Hoteleguide.  According to documents in Gore's own handwriting, Modena was paid $2,000.00 for the referral of Plaintiff, and Modena's subscription agreement was altered by Gore, in Gore's handwriting, stating that Modena's investment was only a "fee of $0.12.5 to Modena."  The Modena Document and Gore's

subsequent actions are clear evidence of fraudulent intent of Gore in inducing Plaintiff's

investment, and is part and parcel of the scheme constructed by Gore, Manson, and later Stark, to

acquire assets in the name of Hoteleguide with the specific intent to divert such assets for the

benefit of Gore, Manson, and the other Defendants herein.

45.     Plaintiff discovered that he had been defrauded by Modena, Drayer and Gore on

or about December 11, 2009, when Gore filed an involuntary bankruptcy petition against

Hoteleguide and documents were acquired by counsel for Hoteleguide revealing the facts cited

above that were actively concealed by the Defendants since November 2006.  Plaintiff will show

he filed the causes of action herein within five (5) years of the violations occurring herein.

## VI.
## CAUSES OF ACTION

### COUNT ONE:
### (Against All Defendants)
### OFFER AND SALE OF UNREGISTERED SECURITIES
### VIOLATIONS OF EXCHANGE ACT §§ 5(a) and 5(c)

46.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 45 of this

Complaint as if fully set forth herein.

47.     As described above, Defendants: (a) made use of means or instruments of

transportation or communication in interstate commerce or of the mails to sell, through the use or

medium of a prospectus, subscription agreement or otherwise, securities as to which no

registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried

and/or cause to be carried through the mails or in interstate commerce, by means or instruments

of transportation, securities as to which no registration statement was in effect; or (c) made use

of means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to

which no registration statement had been filed.

48.     No valid registration was filed or in effect with the Commission pursuant to the Securities Act and no exemption existed with respect to the securities and transactions described in this complaint.

49.     By engaging in the foregoing conduct, Defendants violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**COUNT TWO:**
**(Against all Defendants)**
**SECURITIES FRAUD**
**VIOLATIONS OF EXCHANGE ACT § 17(a)**

50.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     Defendants directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of the aforementioned securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have each: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of the securities.

52.     By engaging in the conduct alleged above, Defendants violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**COUNT THREE:**
**(Against all Defendants)**
**SECURITIES FRAUD**
**VIOLATIONS OF EXCHANGE ACT § 10(b)**
**and EXCHANGE ACT RULE Rule 10b-5**

53.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.     Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

55.     By engaging in the conduct alleged above, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**COUNT FOUR:**
**(Against Bill Drayer and Barry Gore )**
**UNREGISTERED BROKER OR DEALER**
**VIOLATIONS OF EXCHANGE ACT § 15(a)**

56.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.     Defendants Bill Drayer and Barry Gore made use of the means and instrumentalities of interstate commerce and of the mails to effect, induce, and attempt to induct the purchase and sale of securities without being registered with the Commission as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(a)] and when no

exemption from registration was available.

58.     Among other things, Defendants Bill Drayer and Barry Gore contacted individuals residing in California and Texas to solicit the purchase of subscription agreements or other interests in Hoteleguide, Inc.

59.     By engaging in the conduct alleged above, Defendants Bill Drayer and Barry Gore violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o].

**COUNT FIVE:**
**FRAUD IN SALE OF A SECURITY CONTRARY TO**
**ARTICLE 581-1, et seq. OF THE**
**TEXAS SECURITIES ACT (ALL DEFENDANTS)**

60.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61.     Due to the intentional misrepresentations referenced above, Defendants have violated the Texas Securities Act in the marketing and sale of interests in the Hoteleguide. Accordingly, Plaintiff is entitled to rescission of its investment in the Hoteleguide, plus all applicable interest and statutory damages set forth under the Texas Securities Act.  Plaintiff will show that these misrepresentations constitute a separate primary violation of the Texas Securities Act.

**COUNT SIX:**
**Against Defendants Gore, Drayer, and Modena**
**FRAUD IN SALE OF A SECURITY CONTRARY**
**TO ARTICLE 581-33A, F(1) AND F(2)**
**OF THE TEXAS SECURITIES ACT**

62.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.     Due to their misrepresentations and sale of securities either unregistered or sold by an individual unregistered or unlicensed in the State of Texas, Defendants Gore and Drayer

committed a primary violation of Texas Securities Laws.

64.     Defendants Gore, Drayer, and Modena represented the HFS-HTG, then later, the "Hoteleguide" investment money would be repaid to Plaintiff in the first quarter of 2008; that the investment was safe and legitimate, and Gore had extensive experience in the hotel advertising and satellite television industries; that Hoteleguide possessed current advertisers and revenue at the time of Plaintiff's investment; and that Modena had invested $340,000.00 into Hoteleguide as additional inducement for Plaintiff, rendering Plaintiff's investment safe, protected, and fully funded by other known investor money.

65.     All such statements were materially false and intended to procure Plaintiff's investment in HFS-HTG, and later, Hoteleguide.  Defendants intended to deceive Plaintiff and acted with reckless disregard for the truth of the representations made to Plaintiff.   The Defendants, acting in concert, benefited by not disclosing such representations, statements, and omissions were false and misleading for the purpose of inducing the Plaintiff to enter into a contract and to transfer funds to the Defendants, of which they immediately took up to $50,000.00 for their own use and benefit, and not for the business of developing the Hoteleguide business to further the promised repayment to allegedly occur in the first quarter of 2008.  These violations of Texas law caused Plaintiff damages in excess of $400,000.00.

## COUNT SEVEN
### Against All Defendants
### CIVIL CONSPIRACY AND AIDING AND ABETTING IN THE FRAUDULENT SALE OF SECURITIES UNDER FEDERAL AND STATE LAW

66.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 65 of this Complaint as if fully set forth herein.

67.     Defendants Gore, Drayer, and Modena actively conspired to fabricate false documents and set out false representations to induce Plaintiff to purchase unregistered and non-

exempt securities from an unlicensed broker-agent.  Gore, Drayer, and Modena knew of the falsity of the statements when made to Plaintiff and conspired with Defendant Manson to conceal relevant omitted material facts from him.

68.    Plaintiff will show the sale of Hoteleguide-based investment agreements occurred at Gore's direction and with his promotion from November 2006 through as late as April 2008. Gore provided Manson, the unlicensed broker-agent, with documents and specific instructions regarding Plaintiff's investment upon Gore's departure from Hoteleguide in June 2007.  All of the money illegally procured by Gore and Manson went to their own use and benefit, or for the use and benefit of entities or individuals assisting in the transfer of Hoteleguide's assets, including investor deposits, to Defendant E-Guide, and later, Gore's Vertical Media Holdings alter ego.

69.    Defendants Stark, FYI, E-Guide Services, Inc. and Vertical Media Holdings (owned and controlled by Gore) entered into tacit or express agreements with Gore and Manson to actively assist in the formation of Defendant E-Guide Services, Inc. and to transfer all of Hoteleguide's valuable assets to such entities owned, controlled, or managed by them.  As early as February 11, 2007, Defendants Stark and FYI were conspiring with Gore to eliminate the then-existing ownership structure of Hoteleguide for the benefit of Gore, Stark, and FYI.

70.    During the formation and execution of the conspiracy between Gore, Manson, Stark, and FYI to transfer Hoteleguide's assets to E-Guide, all Defendants were aware that Gore procured investor money based upon the continuation of the Hoteleguide business, and that Manson continued to actively solicit investors in Texas and California while these Defendants were contemplating a scheme to destroy Hoteleguide's business for their own benefit.  In fact, Stark was soliciting potential investors of his own during the period.  In addition, Manson and

Gore had discussed, on several occasions, Gore's plan to file an involuntary bankruptcy petition against Hoteleguide in his own name, or through others, while Manson was soliciting investors.

71.     Plaintiff will show that all of these Defendants had an active or participatory role in the single issuance of investments in Hoteleguide from November 2006 to April 2008, said issuance being unregistered and sold by unlicensed agents, and such agents, Manson particularly, should not have been offering securities for sale due to their prior convictions for fraud.  This single enterprise used the same documents, unlicensed broker, and acted with common purpose to either (1) misrepresent the status of Hoteleguide's business to induce investors, or (2) act in concert with those illegally selling securities to assure such contract would never have value, to the detriment of all such investors and for specific and sole benefit of the conspiring Defendants. Defendants intended to deceive Plaintiff and other investors for this single purpose and caused Plaintiff damages in excess of $400,000.00.

## COUNT EIGHT:
### (All Defendants)
### RACKETEER INFLUENCED AND CORRUPT PRACTICES ORGANIZATION ACT IN VIOLATION OF 18 U.S.C. § 1962(c)

72.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 71 of this Complaint as if fully set forth herein.

73.     At all relevant times, the Defendants constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

74.     All Defendants were individual "persons" within the meaning of 18 U.S.C. § 1961(3) and §1962(c) who associated with and/or participated in the conduct of said enterprise's affairs.

75.     The  Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering

activity within the meaning of 18 U.S.C. § 1961(1), § 1961(5), and §1962(c).  The pattern of racketeering activity consists of mail and wire fraud.  These acts all occurred after the effective date of the RICO Act, and more than two (2) such acts occurred within ten (10) years of one another.

76.    **Barry Gore's Participation**:  As the drafter of the subscription agreements and manager of the process for soliciting investors, including the illegal retention of Bill Drayer, Gore directed, controlled and approved all racketeering activities taken in furtherance of the racketeering activity including: (a) the Defendants' gross and purposeful overstatement of the market potential of the investment; (b) procuring mail and payments from the Plaintiff totaling $400,000.00 , and in excess of $3,000,000.00 total from all defrauded investors, and putting such payments towards purposes other than the projects in which Plaintiff had agreed to invest, including paying himself and Drayer excessive, undisclosed fees for procuring these illegal investments; (c) inducing Plaintiff to invest in Hoteleguide employing a fraudulent scheme whereby a trusted confidant of Plaintiff, Rick Modena, was directly compensated by Gore for falsely stating that he (Modena) invested $340,000.00 in cash in the fraudulent HFS-HTG/Hoteleguide investment; (d) using fraudulent and fabricated documents that Gore later admitted were false and never intended to be enforceable as written and presented to Plaintiff; (e) illegally withdrawing investor assets from Hoteleguide accounts for personal use, and charging undisclosed fees for illegally procuring investor money; (f) orchestrating the destruction of Hoteleguide's business, causing total devaluing of the Hoteleguide investments without disclosure to investors; and (g) and concealing the enterprise and pattern of racketeering activity from Plaintiff and other investors he spoke with from February 11, 2007 to August 2007.

77.    **Defendant Bill Drayer's Participation**.  Defendant Drayer violated several state

and federal securities law and regulations by acting as an unlicensed securities broker-agent in the offering and sale of Gore's interstate securities issuance later assumed by Manson. Drayer acted to further this illegal scheme by continuing to meet with potential investors despite his knowing lack of authority as set forth by applicable state or federal government regulatory agencies. By his own admission, Drayer actively assisted Gore in the procurement and loss of over $850,000.00 in investor funds. Drayer was paid approximately $88,000.00 by Gore and Manson for his participation in Gore's fraudulent scheme.

78.    **Defendant Rick Modena's Participation.**   Defendant Modena assisted Gore with the scheme by agreeing to falsify the terms of subscription agreement(s) drafted by Gore falsely and fraudulently indicating Modean invested $250,000.00 (and, according to Modena, up to $340,000.00), when, in reality, Modea invested nothing and was paid $2,000.00 for fabricating his subscription agreement, inducing Plaintiff to invest.

79.    **Defendant Dean Manson's Participation.**   As Gore's long-time friend and business associate, Manson had knowledge of virtually every aspect of Gore's scheme to defraud investors and misappropriate their investments in Hoteleguide. Manson, reviewed, provided advice, and used the subscription agreements for the illegal unregistered issuance. Manson communicated with Gore before, during, and after Gore's departure and coordinated between the separate parts of the scheme from soliciting investments to assisting Gore to transfer such assets to E-Guide, owned by Stark and Gore. Manson also furthered the scheme by misrepresenting his background and experience, omitting the fact that he was a convicted felon, disbarred attorney, and career fraud. Manson is the author of several e-mails summarizing his discussions with Gore and coordinating Gore's scheme to present day. Finally, Manson, through his counsel and office mate, David Gibson, caused Gore to be able to stick Hoteleguide into bankruptcy to assist Gore

in avoiding the consequences of the civil suit and revelations of additional information about Defendants' plan.

80.     **Defendants Chris Stark, FYI, and E-Guide's Participation.**  Defendant Stark first revealed his intent to assist Gore in misappropriating Hoteleguide's assets on or about February 11, 2007 during a dispute between Gore and the owners of Hoteleguide.  At all times relevant, Stark knew Gore and Manson were taking investor money by way of the "subscription agreements" and such money was being used to compensate Gore, Stark, and other co-conspirators during their plan to transfer assets to E-Guide.  At all times relevant, Stark's association with Gore and Hoteleguide was as a representative of FYI, a vendor of content used in Hoteleguide's business.  Stark eventually invested in Hoteleguide and received purported ownership rights from Gore without approval from a majority of the shareholders of Hoteleguide.  FYI, by and through Stark, formed E-Guide Services, Inc. shortly before Gore left Hoteleguide, solely for the purposes of allowing Gore a business vehicle in which to conduct the business misappropriated from Hoteleguide, and were a party to executed vendor and customer contracts that were removed from Hoteleguide.  During these activities, Stark, as an agent of FYI and E-Guide Services, knew Manson continued to solicit and receive funds from investors that would be used in the payments to Gore, Stark, FYI, and Manson and be part and parcel of the fraud and misappropriation the Defendants were exacting on Plaintiff, Hoteleguide, and the other investors.

81.     **Defendant Vertical Media Holdings, Inc.' s Participation**.  Defendant Vertical Media Holdings, Inc. was formed by Gore on February 9, 2009 during Hoteleguide's litigation against him in order to fraudulently transfer the property misappropriated from Hoteleguide to E Guide Services, Inc, in order to make it more difficult for investors such as Plaintiff to track

Gore's use and concealment of investor money and assets subject of his theft and the scheme referenced herein  Upon information provided by E-Guide Services, Inc., Vertical Media and other ruse companies formed by Gore are charging E-Guide Services, Inc. in excess of $1,200,000.00 in employment expenses for servicing the business misappropriated by Gore and E-Guide and transferred to Vertical Media Holdings, Inc.

82.     At all relevant times, the enterprises were engaged in, and their activities affected, interstate commerce.

83.     All of the predicate acts described herein establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in possessing a common purpose and result, namely, to defraud Plaintiff of his money.  Defendants effectuated such predicate acts of racketeering individually, or through their agent or agents, directly or indirectly. All such acts of racketeering; and/or the acts of racketeering were related to each other by distinguishing characteristics, events, motives, and agreements between the Defendants and were not isolated events.

84.     All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that the Defendants engaged in the predicate acts over a substantial period of time or in that such predicate acts had become the Defendants' regular way of conducting business.

85.     As a direct and proximate result of and by reason of the activities of the Defendants, and their conducts in violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property, within the meaning of 18 U.S.C. § 1964 (c).  Among other things, Plaintiff has suffered damages in the amount of money he paid for the unregistered fraudulent securities of Defendants.  Plaintiff is, therefore, entitled to recover threefold the damages he has

sustained, together with the costs of this lawsuit, including costs, reasonable attorneys' fees, and reasonable experts fees.

## COUNT NINE:
## CONSPIRACY TO ENGAGE IN A PATTERN OF
## RACKETEERING IN VIOLATION OF 18 U.S.C. § 1962(c)

86.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.     As specifically enumerated above, Defendants associated with an enterprise engaged in interstate commerce and whose activities directly affected interstate commerce.

88.     Defendants conducted and participated, either directly or indirectly, in the conduct of the affairs of Gore, E-Guide Services, Inc., and Vertical Media Holdings, Inc. through a pattern of racketeering in violation of 18 U.S.C. § 1962(c) and (d).

89.     Defendants cooperated jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in 18 U.S.C. § 1961 (1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(d).

90.     Defendants did commit two (2) or more of the predicate acts itemized above in a premeditated and intentionally calculated manner that would continue their racketeering activities in violation of 18 U.S.C. § 1962(d).

91.     As a direct and proximate result of and by reason of the activities of the Defendants, and their conducts in violation of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964 (c).  Among other things, Plaintiff has suffered damages in the amount of money he paid for the unregistered fraudulent securities of Defendants.  Plaintiff is, therefore, entitled to recover threefold the damages he has

sustained, together with the costs of this lawsuit, including costs, reasonable attorneys' fees, and reasonable experts fees.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear herein, and that upon trial on the merits of the allegations herein made, this Court find in favor of Plaintiff and against the Defendants, jointly and severally, on all counts and claims alleged herein against the Defendants, and thereby award Plaintiff a Judgment against each of the Defendants in the amount of $400,000.00 in actual damages, punitive damages in the amount of $1,320,000.00, plus attorney's fees as may be submitted at trial, plus all costs of court, plus attorney's fees and costs of court which may become necessary upon any appeal taken by any Defendant or Plaintiff, plus pre- and post-judgment interest on the entire unpaid amount of judgment at the highest legal rate, plus Special Damages of any transportation, lodging, or miscellaneous costs which have to be expended by Plaintiff at any point of the litigation for Plaintiff or Plaintiff's witnesses which may become necessary in any portion of this cause of action or discovery thereof; and award any and all other relief to which the Plaintiff may show this Honorable Court a just or equitable entitlement thereto; all such relief and award of judgment as requested, supra, to be jointly and severally liable upon each and every Defendant to the Plaintiff in this action.

Respectfully submitted,

**WHITE & CO**

By: _____/s/_____ Christopher C. White_____
      Christopher C. White
      State Bar No. 00794841
      Eric E. Wolfgang
      State Bar No. 00792168
      901 Main Street, Suite 4100
      Dallas, Texas 75202
      Phone: 214-722-7100
      Fax: 214-722-7111

      **ATTORNEYS FOR PLAINTIFF
      TOM BRUCE**